**COMMONWEALTH of Pennsylvania,** Appellee

v.

**Joseph J. JENNINGS, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued June 25, 2008.

Filed Sept. 29, 2008.

Ernest D. Preate, Jr., Scranton, for appellant.

Kenneth A. Osokow, Asst. Dist. Atty., for Com., appellee.

BEFORE: STEVENS, MUSMANNO, and TAMILIA, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Lycoming County subsequent to Appellant's convic-

---

**1.** The Motion to Quash Appellant's Brief, In Particular Section I of Appellant's Argument, is denied as moot.

tions for one count of sexual assault[1] and two counts of indecent assault,[2] and his acquittal on a charge of rape.[3] On appeal, Appellant contends (1) the trial court erred in qualifying a sexual assault nurse as an expert witness and permitting her to make a "medical diagnosis" of the victim's condition, and (2) the jury's verdict was against the weight of the evidence based on the factual record and the jury's verdict was inconsistent. We affirm the judgment of sentence.

¶ 2 The relevant facts and procedural history are as follows: Appellant and the victim initially met while helping Appellant's uncle and aunt move into their new home. After developing a friendship through several phone conversations, Appellant and the victim decided to go out together on the evening of April 13, 2002. The victim picked Appellant up at his home and they decided to go to several different bars where they consumed alcohol and met with friends.

¶ 3 Appellant claims that the victim had too much to drink and smoked marijuana with him. N.T., 1/23/04, at 389, 392. However, while the victim testified that she did have several drinks that evening, she reported feeling fine and in control. N.T., 1/22/04, at 73, 82. The victim explained that she became "annoyed" when Appellant teased her for not smoking marijuana with him. Id. at 77. Near the end of the evening, as she had become bored and anxious to end the date, the victim claimed that she poured her drink out in the bathroom sink. Id. at 78–79. The victim testified Appellant spent most of the evening socializing with his friends, as she sat by herself at the bar, and claimed

"mostly the whole evening ... [I] pretty much knew that I wasn't going to go out with him again." Id. at 63, 76–80.

¶ 4 The victim and Appellant also gave conflicting stories about their romantic conduct that night. Appellant claimed the victim had previously promised to give him a "full body massage" and was affectionate with him that evening, kissing and dancing closely. N.T., 1/23/04, at 381. While the victim admitted that Appellant kissed her a few times during the evening, she denied that she or Appellant ever made sexually suggestive comments or conducted themselves in a like manner. N.T., 1/22/04, at 65, 69–73, 80–81, 83.

¶ 5 At the end of the date, Appellant asked to borrow a movie and followed victim into her apartment although she had never invited him to come in. Id. at 83–84. While the victim went to go check her phone messages, Appellant started watching the DVD in the living room. Id. at 84. When the victim returned, she noticed that Appellant was more intoxicated than she thought, observing him swaying to the music and talking in a jumbled manner. Id. at 85–86. When Appellant mumbled that the victim wanted to see him naked all night, the victim became angry and told Appellant to leave. Id. at 86. Appellant ignored the victim's response and tried to dance with her. Id. After the victim pushed herself away, Appellant walked into the victim's bedroom and collapsed on her bed. Id. at 89–90.

¶ 6 After the victim checked to make sure that Appellant was asleep, she left him on the bed, reasoning that it would be best if he could "sleep it off." Id. at 90. The victim changed into her strapless

1.  18 Pa.C.S.A. § 3124.1.

2.  18 Pa.C.S.A. § 3126(a)(1) (Indecent assault: without consent); 18 Pa.C.S.A. § 3126(a)(2) (Indecent assault: forcible compulsion).

3.  18 Pa.C.S.A. § 3121(1).

nightgown and admitted she was not wearing underwear at the time. *Id.* at 90, 153. As the victim saw that it was raining and Appellant would have to walk home, the victim nudged Appellant's shoulder and told him to sleep on the futon in her living room. *Id.* at 92–93.

¶ 7 After Appellant got out of the bed, the victim climbed under the covers from the opposite side of her bed. Appellant got back into the bed, kissing the victim's neck and shoulder. As she tried to pull away and told him to stop, Appellant continued and grabbed her left hip and breast. *Id.* at 95. The victim struggled to get away and told Appellant "this is me saying no." *Id.* at 96. Appellant pulled down the covers, pulled the victim's nightgown up, and undid his pants. *Id.* at 98. The victim testified that as Appellant was laying on top of her, he was able to penetrate her vagina with his penis. *Id.* Appellant proceeded to turn the victim over and had sexual intercourse in another position. *Id.* at 100. Appellant testified at trial that the victim consented to the sexual intercourse. N.T., 1/23/04, at 398.

¶ 8 After Appellant left, the victim sought comfort in her best friend, who testified at trial that the victim looked "disturbing ... [as] her hair was a mess, her face was white, pale she looked like a deer in the headlights ... [and] she looked like she had been crying." *Id.* at 306. The following morning, the victim told her mother what had happened and they subsequently went to the emergency room. N.T., 1/22/04, at 112–13. Nurse Cathy Brendle, a sexual assault nurse examiner (SANE), performed a rape kit on the victim and submitted her observations and findings to the police.

¶ 9 As a result, Appellant was arrested, brought to a jury trial, and convicted on one count of sexual assault and two counts of indecent assault. The jury acquitted Appellant on a charge of rape. Shortly thereafter, on April 8, 2004, the Honorable Nancy Butts sentenced Appellant to an aggregate term of 6–12 years in prison.[4]

¶ 10 Although Appellant filed a timely post-sentence motion along with a Petition to Modify the Sentence, the trial court denied the motions, and Appellant filed a direct appeal on September 27, 2004.[5] In response, on September 30, 2004, the Honorable Judge Butts ordered Appellant to file a Concise Statement of Matters Complained of on Appeal within fourteen days pursuant to Pa.R.A.P.1925(b). However, Appellant failed to file a 1925(b) statement, and this Court dismissed his appeal on November 29, 2004 for failure to file a docketing statement in compliance with Pa.R.A.P. 3517. Nevertheless, the trial court filed a 1925(a) opinion, addressing the issues presented in the post-sentence motion since the court could not anticipate which issues Appellant would contest.

¶ 11 On December 20, 2004, Appellant filed an application with this Court to reinstate his appeal. We granted the motion and rescinded the order of November 29, 2004. In an unpublished memorandum issued on January 30, 2006, we proceeded to find Appellant's issues to be waived for failure to file a 1925(b) statement, although

---

4. Judge Butts sentenced Appellant to 5–10 years on the sexual assault charge. The two charges of indecent assault were merged and carried a sentence of 1–2 years to run consecutively to the sexual assault charge.

5. Before the hearing on Appellant's post-sentence motions, Appellant's trial counsel petitioned the trial court to withdraw from the case. After allowing Appellant's trial counsel to withdraw, the trial court denied Appellant's postsentence motions and appointed a Public Defender who filed the direct appeal on Appellant's behalf.

we addressed and found meritless his legality of sentencing claim. *Commonwealth v. Jennings*, 1537 MDA 2004, 897 A.2d 518 (Pa.Super. filed Jan. 30, 2006) (unpublished memorandum).[6]

¶ 12 Appellant proceeded to file a timely Petition under the Post Conviction Relief Act (42 Pa.C.S.A. §§ 9541–9546) *(hereinafter* PCRA) on December 4, 2006.[7] After Appellant submitted an amended PCRA petition on February 12, 2007, Judge Butts granted his PCRA petition on June 13, 2007 and allowed him to file an appeal *nunc pro tunc* in connection with the issues waived by his prior counsel's failure to file a 1925(b) statement.[8]

■ ¶ 13 Appellant first contends that the trial court erred in allowing Cathy Brendle, a sexual assault nurse examiner (SANE), to give expert testimony regarding the victim's vaginal redness, which she opined was consistent with "forced vaginal intercourse from behind."[9] Appellant specifically claims Nurse Brendle's testimony constituted an impermissible medical diagnosis because she does not have the training of a medical doctor.

¶ 14 As a general rule, in order to be deemed an expert witness, one must only "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." *Freed v. Geisinger Medical Center*, 910 A.2d 68, 73 (Pa.Super.2006), *appeal granted*, 593 Pa.

354, 930 A.2d 1249 (Pa. Aug. 2, 2007) (NO. 3 MAL 2007) *(quoting Flanagan v. Labe*, 547 Pa. 254, 257, 690 A.2d 183, 185 (1997)). *See* Pa.R.E. 702.[10] Our standard of review for the competency of expert witnesses is well established:

> the question whether a witness is qualified to testify as an 'expert' is within the sound discretion of the trial court and will not be overturned except in clear cases of abuse. In Pennsylvania, a liberal standard for the qualification of an expert prevails. Generally, if a witness has any reasonable pretension to specialized knowledge on the subject matter under investigation he may testify and the weight to be given to his evidence is for the [fact finder]. *It is also well established that an expert may render an opinion based on training and experience; formal education on the subject matter is not necessarily required.*

*Commonwealth v. Ramos*, 920 A.2d 1253, 1255–56 (Pa.Super.2007) *(citing Commonwealth v. Marinelli*, 570 Pa. 622, 810 A.2d 1257, 1267 (2002) (citations and quotation marks omitted)) (emphasis added).

¶ 15 The statutory provisions of Pennsylvania nursing law pose a further limitation on the normal competency standards for expert witnesses. Specifically, the Professional Nursing Law, 63 P.S. § 211 *et*

6. Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

7. An amended PCRA Petition was filed by Counsel for Appellant on February 12, 2007.

8. We find the trial court properly reinstated Appellant's rights of appeal due to the failure of his trial counsel to file a 1925(b) statement. *Commonwealth v. Halley*, 582 Pa. 164, 173, 870 A.2d 795, 801 (2005).

9. Appellant raised the competency and weight of the evidence issues in his post-sentence motion.

10. Rule 702 provides as follows:
> If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
> Pa.R.E. 702.

*seq.*, outlines the definition of a nurse's responsibility:

(1) The "Practice of Professional Nursing" means *diagnosing* and treating *human responses* to actual or potential health problems through such services as case finding, health teaching, health counseling, and provision of care supportive to or restorative of life and wellbeing, and executing medical regimens as prescribed by a licensed physician or dentist. The foregoing *shall not be deemed to include acts of medical diagnosis* or prescription of medical therapeutic or corrective measures, except as may be authorized by rules and regulations jointly promulgated by the State Board of Medicine and the Board, which rules and regulations shall be implemented by the Board.

63 P.S. § 212(1) (emphasis added).

¶ 16 While the Professional Nursing Law forbids nurses from making *medical* diagnoses, the statute allows nurses to diagnose human responses to health problems, which has been distinguished by this Court as a *nursing* diagnosis. The statutory language in 63 P.S. § 212(4) defines a nursing diagnosis as the "identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen." 63 P.S. § 212(4).

¶ 17 In *Flanagan*, our Supreme Court found it proper to exclude a nurse's testimony which constituted a medical diagnosis. The nurse in *Flanagan* would have offered her opinion within a reasonable degree of nursing certainty that the patient's subcutaneous emphysema resulted from and had progressively worsened due to substandard nursing care. The Supreme Court found that the nurse would have given an impermissible *medical* diagnosis when she testified that the patient developed the emphysema at a time earlier than his *physician's initial diagnosis,* which was clearly outside of the nursing regimen.

¶ 18 In contrast to the instant case, it is clear from the record that Nurse Brendle, as a sexual assault nurse examiner, was the only medical personnel to assess the victim's injuries. Qualified by extensive training as a SANE, Nurse Brendle was solely responsible for performing the rape kit and providing a report documenting the victim's physical and mental condition before submitting them as forensic evidence to the police. N.T. 1/23/04, at 326.

¶ 19 In addition to her twenty-seven years experience as a registered nurse in the emergency room, Nurse Brendle completed a course in sexual assault forensic nurse examination at the University of Pennsylvania and a course in pediatric sexual assault examination. Nurse Brendle has attended several continuing education events in the area of sexual assault forensic examination and has conducted forensic seminars and lectures for local colleges, universities, prosecutor's offices, and coroner's offices. We find that Nurse Brendle's nursing diagnosis, her identification of the victim's vaginal redness, was essential to the effective execution and management of the nursing regimen.

¶ 20 When determining whether an expert witness is qualified to testify regarding medical causation, we have previously held that "an otherwise qualified non-medical expert may give a medical opinion so long as the expert witness has sufficient specialized knowledge to aid the jury in its factual quest." *Freed, supra* at 73. In *Freed,* this Court held that a registered nurse was a competent expert witness to testify to the development and worsening of a patient's pressure wounds as a result of breaches in the standard of nursing care. *Freed, supra* at 74. *See also McClain v. Welker,* 761 A.2d 155, 156

(Pa.Super.2000) (finding a Ph.D. neuroscientist could properly testify that children suffered cognitive defects caused by toxic lead poisoning in their rented residence). We find persuasive the decisions of the respected courts of other states who have held that sexual assault nurse examiners are qualified to testify as expert witnesses to the causation of injuries to victims of sexual crimes.[11] As a result, we find the trial court did not err in allowing Nurse Brendle to testify that the victim's vaginal redness was consistent with forced intercourse.

¶ 21 Appellant's next contends that the jury's verdict was against the weight of the evidence. When reviewing a challenge of a conviction based on the weight of the evidence, a trial court may award a new trial only "if the verdict was so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative." *Commonwealth v. Wall*, 953 A.2d 581, 586 (Pa.Super.2008) (citations omitted). Our subsequent review, as an appellate court, does not involve analysis of whether the verdict is against the weight of the evidence, but is constrained to a determination of an abuse of discretion by the trial court. *Id.*

¶ 22 Appellant argues that the factual record shows the victim consented to sexual intercourse based on her sleeping attire and the lack of bodily bruises which would indicate she had been raped. Although Appellant would have us revisit the facts of the case to reconsider whether the conviction was supported by the weight of the evidence, we recognize that the "trier of fact, who determines credibility of witnesses and the weight to give the evidence produced, is free to believe all, part, or none of the evidence." *Commonwealth v. W.H.M.*, 932 A.2d 155, 159 (Pa.Super.2007).

¶ 23 In cases where an appellant contends that "physical evidence is 'inconsistent' with a victim's testimony, but that evidence does not necessarily exculpate him, the fact-finder may entertain a defendant's alternative theory and reasonably reject it." *Wall*, at 586 (upholding the appellant's rape conviction even though the sperm found in the victim's underwear did not belong to the appellant). Thus, we find no basis in disturbing the trial court's determination.

¶ 24 Beyond his argument based on factual evidence, Appellant also claims that the conviction was against the weight of the evidence because the jury rendered an inconsistent verdict when they found Appellant guilty of the assault charges, but acquitted him of rape. In comparing the elements of rape and sexual assault, Appellant assumes that the jury found there was no forcible compulsion, which is a distinguishing element of these crimes. As a result, Appellant concludes that it is contradictory to also find him guilty of indecent assault by forcible compulsion.

¶ 25 We find Appellant's claim to be unfounded as our Supreme Court has previously held "mere facial inconsistency in

---

11. *See Newbill v. State*, 884 N.E.2d 383, 396–97 (Ind.App.2008) (allowing a sexual assault nurse examiner to apply her expertise to testify as to whether redness and irritation in the victim's vaginal area was likely the result of forced sex); *Rodriguez v. State*, 281 Ga.App. 129, 635 S.E.2d 402 (2006) (holding a sexual assault nurse examiner was qualified to testify the child victim's injuries were consistent with digital penetration); *State v. Fuller*, 166 N.C.App. 548, 603 S.E.2d 569 (2004) (finding a sexual assault nurse examiner could testify regarding whether the child victim's injuries were consistent with someone who had been sexually assaulted); *Velazquez v. Commonwealth*, 263 Va. 95, 557 S.E.2d 213 (2002) (finding a SANE was qualified to testify as an expert as to the causation of the victim's injuries).

verdicts is not a valid basis for which to upset a conviction which is otherwise proper since consistency in verdicts is not required." *Commonwealth v. Magliocco*, 584 Pa. 244, 266, 883 A.2d 479, 492 (2005). We have "consistently respected the authority of a jury to find, or to decline to find, the existence of *each* element of *each* criminal offense." *Commonwealth v. Johnson*, 910 A.2d 60, 68 n. 10 (Pa.Super.2006) (emphasis added) (citation omitted).

¶ 26 Inconsistent verdicts are permitted in order to uphold the jury's sole discretion to fashion an appropriate punishment based on the counts on which it chooses to convict. *Commonwealth v. Frisbie*, 889 A.2d 1271, 1273 (Pa.Super.2005) (citation omitted). As we held in *Frisbie*, "[w]hen an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity." *Id.*

¶ 27 Even if we accepted Appellant's assumption that the jury's acquittal of rape was based on a lack of forcible compulsion, we are not aware of any precedent requiring such intra-case collateral estoppel that would bar Appellant's conviction for indecent assault by forcible compulsion.[12] As we have previously held, "[i]f intra-case collateral estoppel was allowable, in the case of mutually exclusive verdicts, either the Commonwealth or the defendant could assert a right to a conviction/acquittal as to the other charge. Of course, this has not been allowed." *Commonwealth v. Kearns*, 907 A.2d 649, 659 (Pa.Super.2006). Thus, we find that the jury's acquittal of Appel-

lant on the rape charge did not preclude his convictions for sexual or indecent assault and we reject Appellant's challenge to the weight of the evidence.

¶ 28 Affirmed.

¶ 29 MUSMANNO, J., files a Dissenting Opinion.

Dissenting Opinion by MUSMANNO, J.:

¶ 1 I respectfully dissent from my learned colleague's analysis regarding the admissibility of the testimony of Nurse Cathy Brendle, a sexual assault nurse examiner.

¶ 2 Section 212(1) of the Professional Nursing Law[13] provides, in relevant part, as follows:

> The "Practice of Professional Nursing" means diagnosing and treating human responses to actual or potential health problems through such services as case-finding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed physician or dentist. *The foregoing shall not be deemed to include acts of medical diagnosis....*

63 P.S. § 212(1) (emphasis added). "Thus, although the statute permits nurses to diagnose human responses to health problems, it expressly prohibits them from providing medical diagnoses. Hence, it recognizes a firm distinction between a nursing diagnosis and a medical diagnosis." *Flanagan v. Labe*, 547 Pa. 254, 690 A.2d 183, 185 (1997).

> The proper scope of a nursing diagnosis is set forth through statutory definitions

---

12. By analogy to civil litigation, "the doctrine of collateral estoppel does not apply to prior determinations within the *same* case." *Griffin v. Central Sprinkler Corp.*, 823 A.2d 191,

195 (Pa.Super.2003) (emphasis added) (quotations omitted).

13. 63 P.S. §§ 211 *et seq.*

of the terms employed in 63 P.S. § 212(1).... "Diagnosing" is defined as "identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen." 63 P.S. § 212(4). "Human responses" are defined as "those signs, symptoms and processes which denote the individual's interaction with an actual or potential health problem." 63 P.S. § 212(6). **Thus, a nursing diagnosis identifies signs and symptoms to the extent necessary to carry out the nursing regimen. It does not, however, make final conclusions about the identity and cause of the underlying disease.**

*Id.* at 186.

¶ 3 In this case, Nurse Brendle's testimony went well beyond the identification of signs and symptoms necessary to carry out the nursing regimen. Nurse Brendle could properly testify regarding her observation of the victim's vaginal redness. However, when Nurse Brendle testified regarding the medical cause of that redness, *i.e.,* "forced vaginal intercourse from behind," her testimony constituted the type of medical diagnosis prohibited by Section 212(1). Because the Legislature has expressly prohibited nurses from making such medical diagnoses, I am constrained to conclude that the admission of Nurse Brendle's testimony constituted error.

¶ 4 Further, Nurse Brendle's testimony was crucial to the Commonwealth's case. At trial, the only two witnesses to the incident, the victim and Appellant, presented conflicting accounts regarding whether the victim had consented to intercourse with Appellant. Thus, Nurse Brendle's medical diagnosis that the victim's vaginal redness was caused by "forced vaginal intercourse from behind" was clearly prejudicial, as it went to the ultimate issue of consent. Accordingly, I cannot conclude that the admission of such testimony constituted harmless error. On that basis, I would reverse and remand for a new trial.