J-A19017-23

2024 PA Super 6

| | | |
|---|---|---|
| JONATHAN THORSON AND GRACE SONG | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDDW, LLC, BDDW DESIGN, LLC, BDDW STUDIO, LLC, M. CROW, LLC AND TYLER HAYS AND JACK SHELTON, GARRETT MCGLOTHLIN AND ERIC ANDERSON | : | No. 3059 EDA 2022 |
| | : | |
| APPEAL OF: EDDW, LLC, BDDW DESIGN, LLC, BDDW STUDIO, LLC, M. CROW, LLC AND TYLER HAYS | : | |

Appeal from the Judgment Entered January 18, 2023
In the Court of Common Pleas of Philadelphia County
Civil Division at No:  190301451

BEFORE:   BOWES, J., STABILE, J., and PELLEGRINI, J.[*]

OPINION BY STABILE, J.:                        **FILED JANUARY 16, 2024**

This appeal involves an employment contract dispute in which EDDW, LLC; BDDW Design, LLC; BDDW Studio, LLC; M. Crow, LLC; and Tyler Hays (Appellants) seek review of a non-jury verdict by the Court of Common Pleas of Philadelphia County (trial court) awarding monetary damages to Jonathan Thorson and Grace Song (Appellees).  Appellants argue that they were given insufficient notice of the trial date, causing the unavailability of Hays, and as a result, the trial court improperly inferred that his testimony would have been unfavorable to Appellants.  They contend further that the trial court

_____

[*] Retired Senior Judge assigned to the Superior Court.

erroneously determined Appellees' damages by relying on an unqualified expert's valuation of their business. We affirm.

BDDW is a luxury home furnishing company founded by Hays in 1995. Since that time, BDDW has been owned and controlled by Hays; he also has been the lead designer of all its products. The corporate entities named as Appellants in this case are, in turn, wholly owned subsidiaries of BDDW, and Hays is the sole member of those entities. BDDW's retail showroom is located in New York City, but it also has maintained offices and manufacturing centers in Philadelphia.

The company's size and revenues increased substantially after 1995, and by 2009, Hays began asking his most valuable employees if they would make long-term commitments in exchange for equity in BDDW. There is no dispute that these offers of partnership were made to Appellees.

Song had worked for BDDW since 2005, and she was named president of the company in 2012. In this role, Song managed BDDW's finances and its human resources department. She also oversaw all its day-to-day operations, and her authority was second only to Hays himself. *See* N.T. Trial, 05/03/22, at 36, 57-60.

According to Song, Hays approached her in 2009 with an offer to make her a partner and give her 3% of the fair market value of BDDW if she would continue as president for another five years. *See id*., at 65-67. Song accepted the offer, but there were no witnesses to the agreement, and the terms were never reduced to writing. *See id*., at 113-14. Hays told her that

he would hire a third party to ascertain the value of BDDW so that her 3% share could be determined from that amount.

Song's employment with BDDW ended in 2018. Hays alleged that she had been intoxicated at several company events, including large gatherings attended by clients. After one such event, an auction, Hays placed Song on leave for 30 days and blocked her from accessing the company's bank accounts and email, which Song had been managing for several years. But when the leave period ended and Song went back to work, Hays immediately terminated her employment. Hays insisted that Song's termination for cause nullified the verbal employment contract and divested her of partnership equity. Song disputed that interpretation of her contract terms, as she did not recall ever being told that her stake in the company could be rescinded in that manner. **See id**., at 29-30, 149-50.

Thorson's circumstances were similar to Song's in several respects. He had been with the company since 2004, and Hays put him charge of BDDW's sales and customer relations. The annual revenue of the company increased from hundreds of thousands to tens of millions during Thorson's tenure. As with Song, there was no written employment agreement between Thorson and Hays.

Thorson had instead verbally agreed in 2009 that if he remained with the company for five more years, he would receive a vested interest in BDDW equivalent to 2% of its fair market value, which was to be later determined by a third-party valuation. Thorson understood that once his partnership

vested, he would have the right to redeem all or part of his share as a cash withdrawal. This was an appealing option to Thorson because he viewed the accrual of equity in the company as a substitute for the security of a 401k retirement plan, which BDDW did not offer. *Id*., at 203-04.

In 2014, after Thorson's interest had vested, he attempted to withdraw funds from BDDW so that he could diversify his assets and purchase a house in New York City for his growing family. Hays refused to disperse the funds. *Id*., at 206. Thorson, Song, and other partners broached the subject again with Hays in 2017, suggesting that their employment contracts should be put in writing. Hays refused. *Id*., at 210-11.

About a year after that, Thorson accepted a position with a different company and negotiated a starting date beginning three months later. When he informed Hays that he was leaving BDDW, Hays claimed that Thorson was not entitled to his partnership equity because he had failed to provide Hays *with one full year of notice* of his resignation date. *Id.*, at 218. Thorson denied that giving a year of notice was ever a condition of his employment, much less that breaching such a condition would result in the loss of his equity in BDDW.

Appellees filed a complaint, and later an amended complaint, alleging that Hays, BDDW, and associated entities breached their verbal employment contracts by depriving them of their partnership equity. They also sought

recovery of lost wages and a declaratory judgment recognizing the validity of their contacts.[1]

To prove the value of BDDW, and by extension, their money damages flowing from the breach of their contracts, Appellees retained Eugene E. Urcan to serve as their valuation expert. At trial, Urcan discussed his professional background and qualifications in the fields of investment banking and valuation services. Although Urcan's academic degrees were in biology and public policy, he held licenses concerning investment banking and the sale of corporate securities; he also had been approved by two state bars to teach valuation courses that would be eligible for CLE credit.

Urcan estimated that he had done about 100 valuations in the prior three years, and over 1,000 total valuations in his career. These valuations were exclusively of private companies, spanning a wide range of industries. About 30% of Urcan's work related to valuations, and the other 70% related to mergers and acquisitions. *See* N.T. Trial, 05/06/2022, at 35-39.

Urcan testified at length about the methodology he applied for BDDW's valuation. He began by focusing on the company's tax returns and financial statements dating from 2013 to 2018. By adding together BDDW's total revenue and cash on hand from 2017 and 2018, Urcan calculated its initial "enterprise value" to be $17,286,262. *Id*., at 37, 55.

---

[1] Appellants filed an answer, as well as counterclaims against Appellees, alleging the theft of trade secrets and confidential information such as client lists and product designs. None of these counterclaims are at issue in this appeal.

The enterprise value was then used in a forward-looking "market multiple" approach to valuation; by that method, BDDW's current value could be increased by a multiple determined from a comparative analysis of similar companies' economic data and long-term outlooks. *Id*., at 55. BDDW's status as a private company required Urcan to compare BDDW to public companies because the data for other private companies was unavailable. *Id*., at 53-60, 73-75.

The list of comparable companies which Urcan gathered had valuations ranging from one to over six times their respective enterprise values. Urcan considered the high and low ends of the range to be outliers, and he believed a public company with a multiple of 4.19 (Muuto, a luxury furniture maker) was the most analogous to BDDW out of all those on the list. *Id*., at 59-60.

Urcan determined that it would be appropriate to calculate BDDW's valuation by first applying multipliers of one to four, arriving at an "enterprise value range" of $17.2 million (multiple of one) and a maximum value of $ 67.6 million (multiple of four). *Id*., at 54-55. His final valuation of BDDW was taken from the average of those two numbers, $42.4 million. *Id*., at 56. This valuation was equivalent to a multiple of 2.47, or almost two and half times BDDW's enterprise value.

Appellants challenged Urcan's qualifications to be a valuation expert on the ground that he had no academic degrees in accounting, finance, or math; he had not been published in a peer review article; and he had not previously

testified as a valuation expert in a civil trial. ***See id***., at 33-34. The trial court nevertheless ruled that Urcan was qualified to be an expert because he had testified to having significant experience in the relevant fields, and there was no evidence refuting that testimony. ***See id***., at 41.

After the trial had concluded, the trial court entered findings of fact and conclusions of law. Appellees and their expert were found to be fully credible. That is, the trial court accepted the testimony of Song and Thorson regarding their entitlement to a share in BDDW. Appellants' stated reasons for rescinding their equity was rejected. The trial court also inferred from Hays' absence and Appellants' omission of his deposition from the evidence that Hays' testimony would have not been helpful to Appellants' case.

On July 6, 2022, a verdict was entered in Appellees' favor, and the award of money damages was based on Urcan's valuation figures for BDDW. However, rather than use the average of the minimum and maximum multiples suggested by Urcan, the trial court instead applied a lower multiple of two, doubling the enterprise value of $17.2 million for a final valuation of $34,572,524.00. ***See*** Trial Court Conclusions of Law, 7/6/2022, at para. 34.

Song was awarded 3% of this valuation of BDDW, as well as liquidated damages in the amount of 25% of wages due, for a total of $1,296,469.95. Thorson was awarded 2% of the valuation of BDDW, as well as liquidated damages in the amount of 25% of wages due, for a total of $864,313.10. The

total money damages amount was $2,160,782.75. In addition, Appellees were awarded attorneys' fees. *See* Trial Court Order, 7/6/2022, at 1.

On July 18, 2022, Appellants filed a motion for post-trial relief raising several procedural and substantive issues, most of which were rooted in the timing of the proceedings, which they claimed violated their due process rights. The motion recounted that the parties had been given notice on April 29, 2022, that the trial would commence in just two business days, on May 3, 2022. Both Appellants and Appellees had agreed prior to trial that not enough notice had been given for them to prepare, and they filed three joint motions to transfer the case or continue it to a later date.

Further, no pre-trial conference took place, and Hays was unable to testify at trial because he was being treated for cancer. Appellants argued that Hays' unavailability was caused by the lack of notice given to the parties and a medical emergency not within Hays' control, making it improper to draw an adverse inference against him. In support of the post-trial motion, Appellants submitted an affidavit from Hays, dated July 18, 2022 (the same day the post-trial motion was filed).

The affidavit stated in relevant part that Hays had been diagnosed with prostate cancer in March 2022, and that his preoperative appointments took place on April 29, 2022; May 3, 2022; and May 4, 2022. The surgery to remove Hays' prostate took place on May 5, 2022. Hays averred that he was

unable to attend the trial because he could not resolve the scheduling conflict between the overlapping dates of the trial and his surgery:

> [I]t is my understanding that at the trial, which began on May 2, 2022, my attorney informed the Court of my cancer surgery and related appointments and explained that was the reason for my not being able to testify in person. **It was my hope at the outset of the trial I would be able to find a window of time during the aforementioned surgery and appointments to provide my testimony . . . but unfortunately as the week progressed, that became impossible**.

Hays Affidavit, 7/18/2022, at 2 (attached as Exhibit "C" of Appellants' Post-Trial Motion, 7/18/2022) (emphasis added).

Appellants also renewed their objection to Urcan's valuation methodology and qualifications as an expert. They argued that Urcan was not qualified because he had no educational background in accounting, finance, or valuation, and he had never before served as an expert witness in those fields at a civil trial. Appellants also asserted that it was improper for Urcan to use public companies as comparables of BDDW when calculating the latter company's valuation.

The post-trial motion was denied and Appellants timely appealed. Appellants filed a statement of errors reiterating the grounds in their post-trial motion. The trial court entered a 1925(a) opinion giving its reasons why the order denying the post-trial motion should be upheld.

The trial court found that Appellants' issues concerning the short notice of the trial date and the lack of a pre-trial conference were waived for purposes of appeal due to a lack of contemporaneous objections at the time the asserted

errors occurred. The adverse inference against Hays was likewise found to be proper because he was an absent party with personal knowledge of the facts which could refute Appellees' claims, and counsel never objected or sought a continuance to ensure his availability to testify. The trial court also ruled that the inference was of no moment because Appellees and their expert were found to be credible regardless, and the evidence was sufficient to support their claims. **See** Trial Court 1925(a) Opinion, 2/16/2023, at 7-12.

With respect to the evidence of BDDW's value, the trial court maintained that it had not erred in relying on Urcan's testimony because Appellants had presented no rebuttal evidence despite having complete access to BDDW's financial records. Appellants' dispute over Urcan's valuation approach was viewed by the trial court as a matter of evidentiary weight rather than one of admissibility. **See id**., at 11-12.

On review of the denial of a post-trial motion for a new trial, we apply an abuse of discretion standard, and pure questions of law are reviewed *de novo*. **See Carlini v. Glenn O. Hawbaker, Inc.**, 219 A.3d 629, 643 (Pa. Super. 2019). "We must review the court's alleged mistake and determine whether the court erred, and if so, whether the error resulted in prejudice necessitating a new trial." **Stalsitz v. Allentown Hosp.**, 814 A.2d 766, 771 (Pa. Super. 2002) (citations and quotation marks omitted); **see also Harman ex rel Harman v. Borah**, 756 A.2d 1116, 1122 (Pa. 2000) (all rulings on a

motion to grant or deny a new trial are subject to a harmless error analysis in which relief is precluded if no prejudice can be shown).

"[T]his Court will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the trial court's determination was manifestly erroneous, arbitrary and capricious, or flagrantly contrary to the evidence." **El-Gharbaoui v. Ajayi**, 260 A.3d 944, 965 (Pa. Super. 2021) (citation, quotation marks, and brackets omitted). "Questions of the weight of the evidence are solely the province of the fact-finder – here, the trial court – who is free to believe or to disbelieve any evidence it chooses. We cannot and will not re-weigh the evidence nor re-assess the credibility of the witnesses." **Ferraro v. Temple Univ.**, 185 A.3d 396, 406 (Pa. Super. 2018) (citations omitted).

We first consider Appellants' claim that their due process rights were violated because they had insufficient notice as to when the trial would commence. Before addressing the substantive merits of that issue, however, we must first determine if it was waived.

"In order to preserve an issue for appeal, a litigant must make a timely, specific objection at trial and must raise the issue on post-trial motions." **Reilly by Reilly v. Southeastern Penn. Transp. Auth.**, 489 A.2d 1291, 1296 (Pa. 1985). "[I]f no objection is made, error which could have been corrected . . . during trial by timely objection may not constitute a ground for post-trial relief." Pa.R.C.P. 227.1(b)(1)(Note).

- 11 -

There is "no legitimate . . . distinction . . . between the situation where the claim is not timely raised and where the remedy sought was not timely pursued." *Tagnani v. Lew*, 426 A.2d 595, 597 (Pa. 1981). Even a pre-trial motion *in limine* which is later violated at trial is insufficient to avoid the waiver of appellate relief if a contemporaneous request for a remedy is not sought. *See McMillen v. 84 Lumber, Inc.*, 649 A.2d 932, 934 (Pa. 1994) (holding that counsel had waived right to a mistrial by failing to object at the time of a blatant violation of court's pre-trial ruling).[2]

In this case, Appellees filed suit on March 12, 2019. The trial court entered a case management order on June 11, 2019. Revised case management orders were entered on August 9, 2019; December 1, 2020; June 7, 2021; and September 27, 2021. A final revised case management order entered on December 10, 2021, stated that the case would be *ready for trial by January 3, 2022.*

A judge *pro tem* conducted a court-ordered mediation on December 20, 2021. It was suggested by the judge *pro tem* that the case could be suitable

---

[2] Our Supreme Court has recognized that a trial court may in "truly exceptional circumstances" have discretion to grant a new trial, *sua sponte*, to correct an unpreserved error. *See Temple Estate of Temple v. Providence Care Center, LLC*, 233 A.3d 750, 766 (Pa. 2020). An error that is recognized, but unpreserved, may be remedied in that fashion where "exceedingly clear error" of a "constitutional or structural nature" causes "manifest injustice" of "such magnitude as to amount to a severe deprivation of a party's liberty interest." *Id*. In our research, we have found no cases holding that a trial court erred in *not* granting a new trial, *sue sponte*, to correct an unpreserved claim of error, and Appellants have cited none.

for the Commerce Court program, and that the parties could apply for it at the upcoming pre-trial conference. The pre-trial conference scheduled for January 3, 2022, was never held, and the parties did not apply for the Commerce Program because they had expected to do so at that proceeding.[3]

Almost four months after the trial-ready date of January 3, 2022, the parties received notice (on April 29, 2022), that the case would be listed for trial on May 3, 2022, at 9:30 a.m. The notice indicated that all parties and witnesses would be permitted to appear remotely.

On the afternoon of April 29, 2022, the parties filed a joint motion for extraordinary relief seeking the transfer of the case to the major jury program, which facilitates case management conferences and the coordination of civil cases for trial. The parties requested a jury and stated their agreement that all claims were monetary in nature, not equitable. The parties also filed a joint motion for extraordinary relief seeking either an extension of the case management deadlines or a continuance of the scheduled trial date pending a ruling on the joint motion to transfer. Both motions were denied a few hours later.

_____

[3] The record does not indicate why no pre-trial conference was held. But we note that the action appears not to meet the eligibility criteria for assignment to the Commerce Court program. The Philadelphia Court of Common Pleas' website provides a list of the Cases Not Subject to the Commerce Program, and "employment law cases" are among the enumerated types of action. *See* https://www.courts.phila.gov/pdf/cpcvcomprg/criteria.pdf.

On May 2, 2022, the parties filed another joint motion for extraordinary relief seeking an extension of the case management deadlines, or in the alternative, "a continuance of the scheduled trial date so that the parties [could] adequately prepare their clients and ensure their attendance in this complex matter." None of these motions mentioned that Hays was diagnosed with cancer in March 2022, or that he had a surgery scheduled the week of the trial. The motion was denied.

On the first day of trial, May 3, 2022, the parties discussed with the trial court the procedural posture of the case, and their disappointment at not having had a pre-trial conference. The parties also conferred with the trial court about their request for a continuance and an imminent (but not yet filed) motion for a transfer to Commerce Court.

The trial court reminded the parties that a judge *pro tem* could only make recommendations about how they should proceed, and that there was no guarantee that a transfer would be granted. **See** N.T. Trial, 5/3/2022, at 9-12. The parties always had a duty to "be prepared for trial once [they] got notice [to be ready by January 3, 2022]." **Id**., at 19-20.

Additionally, the trial court stressed that it had no authority to decide any of the motions that had been filed because they were within the purview of administrative judges. During a brief adjournment, the application for a transfer to the Commerce Court was filed. The trial court then contacted the assigned administrative judge and relayed to the parties shortly thereafter

that neither a continuance nor a transfer would be granted. *See id*., at 14-17, 19-21.

The trial began, and in his opening statement, Appellants' counsel revealed Hays' medical condition:

> I just want to start by informing the court, I probably should have brought this up earlier, I just didn't want to disclose my client's medical history. Tyler Hays unfortunately has cancer surgery Thursday. He's been in preop appointments all week. **I've been in contact with him and informed him of what's going on and he informed me that he will make himself available even if he needs to step out and hop on a call**.

N.T. Trial, 5/3/2022, at 28-29 (emphasis added). On the second day of trial, May 4, 2023, it was the trial court who broached the subject of Hays' availability by asking counsel if Hays would be called to testify. Without further elaboration, counsel simply responded that he would not be called:

> **Trial Court**: Good afternoon. We'll continue with defense's next witness.
>
> **Counsel**: Your Honor, before I call my next witness, I just want to alert the court, I intend on calling Mr. Ramsey next followed by Mr. Michael Junkins. My last witness, Miss Gavagan, is in the middle of a doctor's appointment right now. I was wondering if Your Honor would be willing to hear her testimony first thing tomorrow before plaintiff's expert.
>
> **Trial Court**: Not a problem, not a problem. **Are you still bringing in – you indicated that [Hays] has cancer. Is he still testifying**?
>
> **Counsel**: **No, [Hays] is not testifying**.

N.T. Trial, 5/4/2023, at 94-95 (emphases added).

This was the first time that Appellants had represented to the trial court that Hays would not be appearing at the trial. And when Appellants finally did inform the trial court of Hays' unavailability midway through trial on May 4, 2023, they did not ask for a continuance, a new trial, or any other form of relief. *See id*.

Had Appellants timely apprised the trial court that Hays' medical condition would make it impossible for him to testify due to cancer surgery, a remedy may have very well been warranted. Here, though, Appellants did not seek relief to accommodate Hays' medical needs until *after* a verdict was rendered, by which time the issue was waived. ***See Reilly***, 489 A.2d at 1296; ***Tagnani***, 426 A.2d at 597; ***McMillen***, 649 A.2d at 934; ***see also*** Pa.R.C.P. 227.1(b).

Appellants have attempted to frame their pre-trial motions as being broad enough to encompass the error raised in their post-trial motion, but the issues in those two stages of the case were materially different. ***See*** Appellants' Brief, at 24-27. As discussed above, the joint pre-trial motions for a transfer and a continuance spoke generally to the parties' lack of preparedness, not the specific unavailability of Hays due to cancer treatments – a situation which had yet to materialize on the record.

Again, on the first day of trial, counsel advised the trial court that Hays would be ready and able to testify later that week, and as of the second day of the trial, it was still presumed that Hays would be testifying. ***See*** N.T. Trial,

5/3/2022, at 28-29. Once Hays' circumstances changed as the trial unfolded, it was incumbent on counsel to explicitly raise the unforeseen occurrence as the basis of a new motion. The parties' earlier opposition to the short notice of the trial was not a license for them to skirt the preservation rules and wait until after the verdict was entered to specify their additional grounds. Thus, the trial court correctly determined that Appellants waived the notice and due process issues raised in their post-trial motion, thus preventing us from reaching their merits.

For related reasons, the trial court did not abuse its discretion in drawing an adverse inference against Hays. "It is settled law that a party's failure to testify at a civil trial raises an inference of fact that the party's testimony would have been adverse or unfavorable to him." *Fitzpatrick v. Phila. Newspapers, Inc.*, 567 A.2d 684, 687 (Pa. Super. 1989). "Where evidence which would properly be part of the case is within the control of the party whose interest it would naturally be to produce it, and without satisfactory explanation, he fails to do so," an adverse interest may be drawn against that party. *Haas v. Kasnot*, 92 A.2d 171, 173 (Pa. 1952) (citation omitted).

Appellants argue that the inference was improper here because Hays' medical condition was a satisfactory explanation for his absence. The argument is unavailing because Hays did not submit his affidavit giving the explanation until after the trial had concluded, the verdict was entered, and an adverse inference was already drawn. Just as importantly, no explanation

was ever given for Appellants' decision not to introduce Hays' deposition once it was resolved during trial that he would not be testifying.

The issue was also unpreserved. When Appellees requested the adverse inference at the close of the evidence, Appellants' counsel did not object, much less argue that it should be denied. Counsel only acknowledged that he had hoped to put Hays on the stand as the "star witness," and as it turned out, Hays' cancer treatment caused him to be in "no shape" to participate in the proceedings. *See* N.T. Trial, 5/6/2022, at 125.

It is crucial that counsel did not specifically object to an adverse inference prior to the trial court's deliberations. "[W]e will not consider a claim on appeal which was not called to the trial court's attention at a time when any error committed could have been corrected." *Krepps v. Snyder*, 112 A.3d 1246, 1255 (Pa. Super. 2015) (holding that a party's failure to specifically and contemporaneously object to an instruction prior to deliberations constituted a waiver of the issue).

Finally, no relief is due because the adverse inference had little to no impact on the verdict. In its 1925(a) opinion, the trial court reasoned that Appellees' evidence was unrebutted and sufficient to find in their favor, independent of the inference. *See* Trial Court 1925(a) Opinion, 2/16/2023, at 9 ("Defense Counsel did not provide any evidence that rebutted [Appellees'] evidence. Therefore, through the testimony[y] and the evidence presented by Counsels, there was more than enough evidence to find in [Appellees']

favor."). The record indeed contained sufficient evidence for the trial court to rule in favor of Appellees. Thus, even if an adverse inference was erroneously drawn, Appellants' objection to it was waived, and in any event, the asserted error was harmless.

We now address Appellants' claim regarding the qualifications of Appellees' expert witness, and the trial court's use of that evidence to calculate the value of BDDW. Generally, to qualify as an expert witness, one must only "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." **Flanagan v. Labe**, 690 A.2d 183, 185 (Pa. 1997). In determining whether to admit expert testimony, the usual test to be applied is "whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question." **Id**.

Urcan testified at trial about his professional background and the approach he took to produce a valuation of BDDW. All the data he relied on when applying his methodology was entered into evidence. Appellants had the opportunity to cross-examine Urcan. They were also free to refute his testimony with their own evidence of BDDW's value, but they declined to do so.[4]

_____

[4] The short notice of the trial does not explain the absence of such evidence, especially since Hays had already had at least one valuation of BDDW done before this case began. For years, Hays' partners were incentivized by his commitment to determine the company's value so that they could eventually receive their respective equity shares. **See** N.T. Trial, 5/3/2023, at 116-19,
*(Footnote Continued Next Page)*

In sum, Urcan easily demonstrated a reasonable pretension to specialized knowledge regarding BDDW's value, and he was qualified to testify as an expert in that capacity. Appellants presented no evidence which refuted Urcan's testimony. To the extent that Appellants took issue with his credibility, methods, and conclusions, those arguments would go to the weight of Urcan's testimony and not its admissibility as an expert opinion. *See Gunn v. Grossman*, 748 A.2d 1235, 1240 (Pa. Super. 2000) ("The weight to be assigned to expert testimony lies within the province of the [finder of fact]."). Thus, the trial court did not abuse its discretion in denying any of the claims in Appellants' post-trial motion.

Order affirmed.

This decision was reached prior to the retirement of Judge Pellegrini.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/16/2024

---

198-201; N.T. Trial, 5/4/2023, at 11-14, 60. These prior valuations were never disclosed.