**Michael R. and Susan K. GARTLAND, h/w, Appellants,**

**v.**

**Joel L. ROSENTHAL, J.C. Blair Memorial Hospital, Richard R. Didonato and Niteen N. Sukerkar, Appellees.**

Superior Court of Pennsylvania.

Argued Dec. 9, 2003.

Filed April 23, 2004.

Reargument Denied July 1, 2004.

Charles E. Evans, Pittsburgh, for appellants.

Michael C. Mongiello, Harrisburg, for Sukerkar, appellee.

Charles W. Kenrick, Pittsburgh, for J.C. Blair, appellee.

Templeton Smith, Pittsburgh, for DiDonato, appellee.

Frederick Goundry III, Frederick, Md., for Rosenthal, appellee.

Before: KLEIN, BENDER and OLSZEWSKI, JJ.

OPINION BY KLEIN, J.:

¶ 1 Michael Gartland filed suit alleging that several doctors failed to diagnose and test for a brain tumor, resulting in delay in removal of the tumor and consequent loss of cognitive and motor functions. The trial court granted summary judgment, holding that a neurologist could not comment on the standard of care for radiologists. Further, the trial court held

that supplemental reports from other experts were late, believing they had violated a stipulation of the parties as to discovery and could not be submitted. We conclude the trial judge erred on both rulings and reverse and remand for trial.

I. Facts and procedure

¶2 On May 26, 1987, Michael Gartland was involved in a motor vehicle accident. A month or so afterwards, he began to experience seizures, loss of consciousness, intense dizziness, and headaches. Initially, it was thought that his problems were related to the accident. In 1992, five years later, an MRI revealed that Gartland had a brain tumor. The tumor was surgically removed, but Gartland allegedly suffers from impaired cognitive and motor functions.

¶3 The gist of the complaint, as outlined in the expert report submitted on behalf of Gartland by Dr. Stephen S. Kamin, a neurologist, was as follows:

1. Gartland's neurologist, Dr. Joel L. Rosenthal, failed to consider the possibility of a tumor.

2. The first radiologist to see Gartland, Dr. Richard R. DiDonato, misread the CT scan and failed to report on the possibility of a tumor and recommend an MRI.

3. The second radiologist, Dr. Niteen N. Sukerkar, failed to emphasize adequately the possibility of a tumor and failed to recommend an MRI strongly enough.

¶4 In his report, Dr. Kamin stated to a reasonable degree of medical certainty that each of these doctors deviated from the standard of care and that each increased the risk of harm to Gartland. The claim against J.C. Blair Memorial Hospital was that Dr. DiDonato was an agent of the hospital.

¶5 In 1993, Dr. Rosenthal sent the plaintiffs interrogatories asking for, among other things, the names of all experts plaintiffs expected to call as expert witnesses as well as the substance of each expert's opinions. *See* Pa.R.C.P. 4003.5(a). Interrogatory number 11 to Michael R. Gartland reads:

> For each individual whom you expect to call as an expert witness during the trial of this matter, state that witness's identity, giving name, address, and profession or occupation; subject matter or area on which such expert is to testify; the substance of the facts and opinions to which each such expert is to testify; and a summary of the grounds of each opinion of each expert. Further, please indicate the specialty and/or subspecialty of each expert named.

(*See* Interrogatories from Joel L. Rosenthal, M.D. to Michael Gartland filed June 24, 1993, ¶11.)

¶6 Dr. Rosenthal also sent Michael Gartland a request for production of documents seeking written reports outlining the experts' opinions: "All written reports of each person whom you expect to call as an expert witness at trial." (*See* Request for Production of Documents and Things from Joel L. Rosenthal, M.D. to Michael Gartland filed June 24, 1993, ¶2.)

¶7 On the same date, Dr. Rosenthal filed and served on Susan K. Gartland identical interrogatories and requests for production of documents. (*See* Interrogatories from Joel L. Rosenthal, M.D. to Susan K. Gartland filed June 24, 1993, ¶11; Request for Production of Documents and Things from Joel L. Rosenthal, M.D. to Susan K. Gartland filed June 24, 1993, ¶2.)

¶8 Dr. Sukerkar also served interrogatories and a request for production of documents on the Gartlands that similarly sought the experts' names and their re-

**674**

ports. (*See* Motion of Defendant Niteen N. Sukerkar, M.D., to Compel Discovery, filed August 4, 1994, ¶ 3.) Dr. DiDonato similarly filed interrogatories.

¶ 9 After several motions to compel responses were granted, and the plaintiffs still had not revealed the identity of an expert or a report, on January 27, 1997 Dr. Sukerkar and the plaintiffs stipulated that plaintiffs would produce an expert report against Dr. Sukerkar within 45 days of Dr. Rosenthal's deposition. Three days later, on January 30, 1997, the trial court granted Dr. Rosenthal's Motion to Compel Production of Plaintiffs' Expert Witness Report. Like the stipulation, the order only required plaintiffs to submit one report:

> [I]t is this 30[sic] day of January 1997; [sic] ORDERED that within fifteen days of service of this Order Plaintiffs shall produce *an* expert witness report. Failure to comply with this Order may result in dismissal of this action with prejudice or may result in the imposition of other sanctions.

(emphasis added.)

¶ 10 Plaintiffs finally complied and on February 24, 1997 they produced Dr. Kamin's report. On April 25, 2002 and May 14, 2002, defendant Dr. Sukerkar filed a praecipe to put the case on the November 2002 trial list. *See* 39th Jud. Dist. C.R. No. 39–214.1 (directing prothonotary to list case for trial upon praecipe). Under local rules, the party that praeciped the case onto the trial list must send notice to all counsel and unrepresented parties, and then the trial date is published in both the local legal newspaper and other newspapers of general circulation. *See* 39th Jud. Dist. C.R. No. 39–214.2.

¶ 11 Gartland claims the trial court did not give him notice of the trial date per Pa.R.C.P. 212.1(a) ("In a civil action in which the damages sought exceed the jurisdictional limit for compulsory arbitration and which is to be tried by a jury, notice shall be given by the court of the earliest date on which the case may be tried."). Whether or not the trial court gave him proper notice, he evidently had actual notice, because on August 30, 2002, he filed a "Preliminary Pre-trial Statement." *See* Pa.R.C.P. 212.1 and 212.2. The pre-trial statement contained two additional expert reports, one from a neurosurgeon, Dr. Johnson, and one by a radiologist, Dr. Glick.

¶ 12 Starting in July 2002, the defendants filed motions for summary judgment. The summary judgments were granted, because the trial court believed that Dr. Kamin, as a neurologist, was unable to render an opinion on the radiologists' standard of care, and was not definite enough with respect to the defendant neurologist. The trial court also ruled that the supplemental reports were too late and could not be considered.

II. Discussion

¶ 13 We believe the trial court should not have entered summary judgment, since the plaintiffs complied with the stipulation and order.[2] Additionally, Dr. Kamin was competent to testify on the radiologists' standard of care and his report was sufficient to withstand summary judgment.

**A. Dr. Kamin was qualified to give an expert opinion.**

■ ¶ 14 We disagree with the trial court that Dr. Kamin could not render an opinion about the radiologists' standard of

---

2. We review the grant of summary judgment for abuse of discretion or error of law. Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law. *Murphy v. Duquesne Univ. of the Holy Ghost,* 565 Pa. 571, 777 A.2d 418, 429 (2001).

care. In deciding that he was not competent to opine on the radiologists' performance, the trial court used the older rule that "sometimes it 'may appear that the scope of the witness's experience and education may embrace the question in a general way, but the subject may be so specialized that even so, the witness will not be qualified to testify.'" (Trial Court Opinion, 4/24/03, at 19 *quoting Dambacher v. Mallis,* 336 Pa.Super. 22, 485 A.2d 408, 419 (1984)). Citing that rule, the trial court held that although he was knowledgeable about neurology, Dr. Kamin did not have sufficient specific expertise to offer an opinion about Dr. Sukerkar, Dr. DiDonato, and by implication, the hospital. (Trial Court Opinion, 4/24/03 at 19, 23.)

¶ 15 After the plaintiffs initiated suit, but before the defendants filed the summary judgment motions, the General Assembly passed an act commonly called MCare that among other things, limited the admissibility of expert testimony in medical malpractice cases. *See* Medical Care Availability and Reduction of Error (MCare) Act, 40 P.S. §§ 1303.101–1303.910. It may be that the trial court should have applied the MCare Act rather than the older rule.

¶ 16 However, we need not decide which law properly applied, because even under MCare's tougher standard, Dr. Kamin was qualified to offer an opinion, at least at the summary judgment stage.[3] Under MCare, a physician testifying as an expert on the standard of care in a medical malpractice case must essentially either practice in the same subspecialty or a subspecialty that has a substantially similar standard of care. The expert must also be substantially familiar with the standard of care for the specific care at issue. 40 P.S. § 1303.512(c).[4]

¶ 17 In this case, in response to the summary judgment motion, the plaintiffs filed Dr. Kamin's *curriculum vitae,* which showed he was a neurologist. That established *prima facie* his qualifications to read the X-rays in this case and to offer an opinion on what should have been done under the circumstances. The defendants did not produce any evidence to refute his apparent qualifications to read x-rays to make neurological decisions. While we would probably not find him qualified to render such an opinion if the radiologists were reading X-rays of a leg, we believe that at least at the summary judgment stage and on this record, his opinion on x-

---

**3.** We also think that the trial court improperly disallowed Dr. Kamin's opinion under the older rule. Under prior law, if a doctor had the qualifications and experience to comment on the care of another physician, it did not matter that the other physician was not in the same specialty or subspecialty. *See George v. Ellis,* 820 A.2d 815, 817 (Pa.Super.2003) ("In the field of medicine, specialties sometimes overlap and a practitioner may be knowledgeable in more than one field.").

**4.** Section 1303.512(c) reads:
(c) Standard of care.—In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
  (1) Be substantially familiar with the applicable standard of care for the specific care

at issue as of the time of the alleged breach of the standard of care.
(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care of the specific care at issue, except as provided in subsection (d) or (e).
(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e) [allowing waiver of subsection (c)'s requirements if expert is trained in diagnosis or treatment of condition, as applicable, and defendant provided care outside own specialty or competence].
40 P.S. § 1303.512(c).

rays relating to neurological problems and the standard of care for radiologists reading such x-rays should have been allowed.

### B. The trial court should have allowed the two supplemental reports.

¶ 18 The trial court refused to consider the reports of the two additional experts plaintiffs offered because the reports were available more than five years before, and the plaintiffs did not produce the reports until after the case had been listed for trial and three out of four defendants had moved for summary judgment. (Trial Court Opinion, 4/24/03 at 12.) Citing Pa.R.C.P. 4003.5(b) as authority to exclude an expert not identified in discovery, the trial court refused to consider the additional reports.

¶ 19 In this case, the trial court should have considered the reports. The trial court states that "[t]his case has been dragging on for more than ten (10) years because plaintiffs have not been professionally diligent, and such a great lapse of time cannot but prejudice Defendants." *Id.* at 13. While the plaintiffs were much to blame, the fault is not entirely theirs. The defendants and the trial court also played a significant role in causing the delay.

¶ 20 First and foremost, both the court's order and the parties' stipulation required plaintiffs to submit "an" expert report. This did not mean that the parties had to complete *all* discovery. Rather, they simply had to have one expert report so that the defendants could understand the theory of the case against them and prepare appropriately. Frequently, lawyers in a given case will not get all the trial experts until closer to the trial date. Particularly in a case that is moving slowly, if the experts are retained too far in advance, one might wind up needing new experts

later as the original experts retire, move away, or even die.

¶ 21 And although the defendants did seek the experts' names and reports early in the litigation, they did not take sufficient steps to enforce the requests. When they did get a stipulation and an order, all that was required was "an" expert report. As for the trial court, the order requiring but a single report contributed to the delay. As is discussed below, the trial court should have taken control of the timing and scheduling of the case from the beginning to avoid the protracted litigation seen here. Although the plaintiffs were also at fault, in light of what was actually required of them, the trial court should not have precluded the supplemental reports.

### C. Even without the supplemental reports, Dr. Kamin's report was sufficient to withstand summary judgment.

¶ 22 Dr. Kamin's opinion was sufficient to get this case to the jury. In a nutshell, he stated that the defendants deviated from the standard of care and increased the risk of harm to Gartland. And contrary to the trial court's belief, Dr. Kamin did not state that Dr. Sukerkar should have violated federal law by referring Gartland to his own magnetic resonance imaging (MRI) equipment. *See* 42 U.S.C.A. § 1395nn(h)(5)(c). Assuming without deciding that the trial court is correct in its interpretation of the federal statute, Dr. Kamin did not say that Dr. Sukerkar should have given a self-referral. Rather, he simply stated that Dr. Sukerkar should have recommended the MRI more strongly.

¶ 23 Finally, the trial court also believed that Dr. Kamin's report was too equivocating to establish causation against Dr. Rosenthal. We disagree. The trial court complains that he used the phrases,

"it is likely that..." and "there would have been...." While in an expert's failure to express an opinion with the requisite certainty makes summary judgment proper, that is not the case here. *See Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa.Super.1997). Although the expert need not use special language, with expert medical testimony, the expert must state an opinion within a reasonable degree of medical certainty.

¶ 24 We do not see where Dr. Kamin's report used waffling language at all, let alone regarding Dr. Rosenthal. He specifically stated "to a reasonable degree of medical certainty" that "Dr. Rosenthal deviated from the standard of care in failing to consider the possibility of a tumor in this case." (R.R. 106A.) He then explained how he thinks this caused Gartland injury:

> It is likely that [the tumor] was smaller in 1987 and would have required a less extensive surgical procedure to remove it at that time, with less risk of permanent neurological injury, especially given its critical location near motor and language centers.... It is also likely that Mr. Gartland's seizures would have been better controlled if the tumor had been removed in 1987.

(R.R. 107A.) Although Dr. Kamin did use the words "likely" and "would," such language is ordinary in medicinal opinions (and virtually all expert opinions), since few things are absolutely certain. More to the point, he offered his opinions to a reasonable degree of medical certainty that it was more likely than not that the negligence resulted in greater neurological injury. The report was enough to survive summary judgment; whether to accept his opinion or not was for the jury. *Cf. Eaddy,* 694 A.2d at 642 (summary judgment proper where medical expert failed to identify defendant physician's breach of duty or state that breach caused injury, and reserved further opinion until records were examined).

¶ 25 With respect to the issue of Dr. DiDonato's role as an alleged agent of J.C. Blair Memorial Hospital, since the hospital did not raise this issue in summary judgment, that cannot be a ground to grant summary judgment. Since we have held that Dr. Kamin's report was sufficient to survive summary judgment filed by Dr. DiDonato, the summary judgment motion filed by the hospital also should have been denied.

### D. An active case management system can prevent the problems confronted in this appeal.

¶ 26 The underlying problem in this case is that the parties and the trial court allowed the litigation to become trapped in procedural quicksand. It appears that in the 39th Judicial District the attorneys rather than the trial court control the pace of litigation. The court does not enter the case early to establish firm deadlines. This case's slow progress emphasizes the need for the court to control the timing of discovery, the submission of reports, and the scheduling of the steps leading to trial. If the trial court had taken a more active role, we likely would not be faced today with an old case where the parties are bickering over who should have submitted what and when.

¶ 27 We anticipate seeing more appeals involving these kinds of case management problems under the new venue rules. Before the new rules, the bulk of medical malpractice cases were usually seen in a small number of counties. Now malpractice cases will be filed throughout the state, meaning that counties with less experience in complicated litigation will be called on to manage these suits effectively.

¶ 28 Problems of case management and discovery deadlines were addressed a number of years ago in amendments to the Rules 212.1 and 212.2 of the Pennsylvania Rules of Civil Procedure. These rules, which exclude cases subject to compulsory arbitration, were amended to set up a schedule for the parties to exchange basic information about the evidence each party expects to present at trial. Essentially, at least 90 days before the trial court wants to hold the trial, the trial court gives notice of the trial date. At 60 days before trial, the plaintiff must file what the rules call a "pre-trial statement." At 30 days before trial, the defendant must file its pre-trial statement, and at 15 days before trial any additional defendant must file its statement. *See* Pa.R.C.P. 212.1(b). These deadlines may be altered by published local rule or by order of court. Pa.R.C.P. 212.1(c).

¶ 29 The pre-trial statement is the document listing the evidence the party anticipates presenting at trial. Particularly relevant to this case, the pre-trial statement must contain, among other things, "a copy of the written report, or answer to written interrogatory consistent with Rule 4003.5, containing the opinion and the basis for the opinion of any person who may be called as an expert witness...." Pa.R.C.P. 212.2(a)(5). Additionally, the statewide rules allow the trial court to hold a pre-trial conference where, for example, the court and the parties can resolve issues about expert witnesses. *See* Pa.R.C.P. 212.3(a)(4), (6). It appears that the 39th Judicial District does not precisely follow

this scheme, although the history of this case suggests it should.

¶ 30 Some counties go a step further with specialized local procedures. For example, in Philadelphia County, where a great number of medical malpractice cases and other personal injury cases are filed, every major jury civil action[5] is subject to a case management conference (CMC). Approximately 90 days after filing a major jury action, a CMC is held where specific deadlines regarding such things as discovery cut-offs and expert reports are set and a case management order is entered establishing the deadlines. Any change in these deadlines is generally allowed upon motion and court order. *See* Phila. County General Court Regulations 95–1 (Day Forward Program: Procedure for Disposition of Major Jury Cases filed on and After January 3, 1995); 95–2 (Day Forward Program: Procedure for Disposition of Major Jury cases Filed on and After January 2, 1996).[6]

¶ 31 This system helps the very busy First Judicial District maintain control over a heavy caseload. Moreover, every party is keenly aware at an early stage in the litigation what is expected of them and when. Of course, Philadelphia's system is only one of many possible options, but trial courts must find ways to control cases and keep litigation from becoming bogged down.[7]

¶ 32 Finally, we observe that the problems presented here will likely be obviated by the new medical malpractice pre-trial procedural rules. *See* Pa.R.C.P. 1042.26–1042.32. Applicable only in judicial districts that have not established case man-

---

5. A "major jury civil action" is a civil lawsuit seeking greater than $50,000 in damages where a jury has been requested. *See* Phila. Civ. R. 215(A)(2).

6. *See also* Phila. County Admin. Judge Admin. Order 03–2 (Commerce Case Management Program).

7. For example, the federal courts use a comprehensive case management system, which individual district courts have molded to suit their needs. *Compare* F.R.C.P. 16 *with* E.D.Pa. Local Civil Rule 16.1.

agement deadlines, these rules generally allow a defendant in a med mal case to require a plaintiff to produce report(s) "summarizing the expert testimony that will be offered" to support the plaintiff's claims against that defendant. Pa.R.C.P. 1042.28(b). The request is permitted relatively early in the case—90 days after the defendant has filed its original answer to the complaint. Pa.R.C.P.1942.28(a)(2). And the plaintiff must respond fairly quickly—within 180 days. Pa.R.C.P. 1042.28(b). These rules will help keep information flowing and cases on track.

III. Conclusion

¶ 33 Because Dr. Kamin was qualified to offer an opinion and his report was sufficient to establish a *prima facie* case, summary judgment was improper. It was error to fail to admit the supplemental expert reports. In light of our holding that summary judgment was improper, we also reverse its denial of Dr. Sukerkar's Motion for Leave to Amend New Matter and direct the trial court to reconsider that portion of its order.

¶ 34 Order reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.