J-A13035-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| PAULINE ABRAMOWICH AND JOSEPH ABRAMOWICH | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ANDREW MICHAEL ALBERT, M.D., CONEMAUGH HEALTH SYSTEM, INC., I/A/T/D/B/A MEMORIAL MEDICAL CENTER, AND CONEMAUGH HEALTH INITIATIVES, INC. | |
| APPEAL OF: ANDREW MICHAEL ALBERT, M.D. | |
| | No. 1039 WDA 2014 |

Appeal from the Judgment Entered August 22, 2014
In the Court of Common Pleas of Cambria County
Civil Division at No(s): 2010-1986

BEFORE:  PANELLA, J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 18, 2015**

Andrew Michael Albert, M.D., ("Dr. Albert") appeals from the judgment entered on August 22, 2014 in the Cambria County Court of Common Pleas, in favor of Pauline Abramowich ("Wife") and Joseph Abramowich ("Husband"), (collectively, "the Abramowiches") in the amount of $111,713.70, and against Dr. Albert, Conemaugh Health System, Inc., i/a/t/d/b/a Memorial Medical Center, and Conemaugh Health Initiatives,

Inc.[1]  On appeal, Dr. Albert alleges the trial court abused its discretion by precluding him from testifying as an expert witness in the field of radiology. After a thorough review of the record, the briefs of the parties, and the applicable law, we affirm.

The facts and procedural history of this case, pertinent to this appeal, have been gleaned from the certified record and the parties' briefs, since the trial court did not set forth such information in its Pa.R.A.P. 1925(a) opinion. The medical malpractice suit stems from the administration of anesthesia by Dr. Albert, an anesthesiologist, to Wife, a 73 year-old woman, on December 30, 2008, at the Memorial Medical Center in Johnstown, Pennsylvania, while she was undergoing a scheduled laparoscopic cholecystectomy.  The Abramowiches claim Dr. Albert negligently intubated Wife, causing a one-centimeter esophageal laceration that required a secondary surgical procedure and further hospitalization and treatment.

On May 10, 2010, the Abramowiches instituted this action.  Pleadings and discovery were exchanged.  Prior to trial, Dr. Albert indicated that he intended to testify as an expert in the field of anesthesiology, which the trial court accepted.  He also retained an expert diagnostic radiologist, Dr. Robert Hurwitz, to provide testimony regarding diagnostic images and how they impacted the Abramowiches' theory of liability.  It was Dr. Hurwitz's opinion

_____

[1]  Conemaugh Health System, Inc. and Conemaugh Health Initiatives, Inc. are not parties to this appeal.

that the air or carbon dioxide that was pumped in Wife's stomach during the procedure played an integral role in her injury, and not Dr. Albert's actions.[2]

However, shortly before trial, Dr. Albert indicated that he also intended to testify on his own behalf regarding issues of diagnostic radiology.[3]  The

_____

[2]  Specifically, he stated:

> It [is] my opinion with reasonable medical probability that this is the event that occurred as surgery was begun with distention of the abdominal cavity with $CO_2$ under pressure at time of the laparoscopic cholecystecytomy.   Proof is the finding on the digital scanogram of considerable residual abdominal air ($CO_2$) on the CT scan the night of December 30, 2008.

Dr. Robert Hurtwitz's Expert Report, 9/3/2012, at 2.

[3]  At his deposition, Dr. Albert provided his theory for the cause of Wife's injury based on radiographs and the CAT scan:

> [Wife]'s pneumomediastinum [or air present in the mediastinum] is the consequence of air tracking around her aortic hiatus, which occurred as a result of her pneumoperitoneum in the laparoscopic cholecystectomy.  The air simply tracked up her chest, her neck, and that is what caused the pneumomediastinum.  The pneumomediastinum, if you look at the CAT scan, compressed her esophagus and she couldn't swallow.  The CAT scan was misread to show – and it claims there was a dilated esophagus and it was an extremely compressed esophagus.
>
> After they had the CAT scan and they did not figure what was going wrong, they performed a bronchoscopy, which failed to give any useful information other than the fact that the bronchus was -- the trachea was intact.  So they proceeded to an esophagram.
>
> …

*(Footnote Continued Next Page)*

Abramowiches filed a motion in *limine*, seeking the exclusion of expert testimony by Dr. Albert on the issue of diagnostic radiology, claiming the doctor was not qualified to testify as a diagnostic radiologist, and that any such testimony by Dr. Albert would be cumulative of Dr. Hurwitz's testimony. A hearing was held on March 3, 2014. The following day, the trial court granted the Abramowiches' motion. The matter then proceeded to a jury trial.

On March 6, 2014, the jury entered a verdict in favor of Wife in the amount of $60,000.00, and in favor of Husband in the amount of $40,000.00, and against the Defendants. The Abramowiches filed a motion

*(Footnote Continued)* ───────────────

> The esophagram unfortunately was a traumatic event. Because she had a compressed esophagus and could not swallow, … she kind of vomited and retched. And if you remember her deposition, she described it as being water boarding. The water boarding effect is you are trying to get a person to swallow who can't, so the gastrografin basically hits the vocal cords, and when something like that happens you feel like you are drowning, because that is what happens when you drown[] is fluid goes down your larynx. She kept on vomiting. She said she was held down and this increased the inner thoracic pressure. It caused pressure on the air that was retained in her chest, raising her inner thoracic pressure.
>
> Now, the only place for that air to go is, one, it can go back out the aortic hiatus where it entered, or it can go up and go up in the neck. And, in fact, what happened is it perforated the esophagus at the level just above her first rib, where your -- where your tissues are no longer supported by the rib cage. So that is where it perforated, and that is when it perforated is the esophagram, which is about 2:30 in the morning.

Deposition of Dr. Andrew Michael Albert, 9/11/2012, at 122-123.

for delay damages on March 13, 2014. That same day, Dr. Albert filed a motion for post-trial relief, arguing the court erred in prohibiting from testifying about certain radiology studies concerning Wife because it impeded his ability to defend the allegations against him.

On March 21, 2014, the court granted the Abramowiches' motion for delay damages in the amount of $11,713.70, resulting in a final verdict of $111,713.70. On June 2, 2014, the trial court also entered an order, denying the Defendants' motion based on the following: (1) Dr. Albert did not possess the required common law medical expertise in the field of radiology; (2) Dr. Albert did not possess the required medical expertise in the field of radiology pursuant to the Medical Care Availability and Reduction of Error Act[4] (MCARE Act); and (3) in any event, Dr. Albert's expert testimony would have been cumulative of Dr. Hurwitz's testimony, who was his retained expert. This appeal followed.[5, 6]

---

[4] 40 P.S. § 1303.512.

[5] On June 26, 2014, the trial court ordered Dr. Albert to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Dr. Albert filed a concise statement on July 17, 2014. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 13, 2014, relying on its June 2, 2014, order.

[6] We note Dr. Albert filed his notice of appeal from the court's June 2, 2014, denial of post-trial relief. Although this appeal was filed prior to entry of final judgment, this Court has previously determined jurisdiction may be perfected after the appeal notice has been filed upon the proper docketing of a final judgment. *Johnston the Florist v. Tedco Const. Co.*, 657 A.2d
*(Footnote Continued Next Page)*

In his sole issue on appeal, Dr. Albert claims the trial court erred by granting the Abramowiches' motion in *limine* and precluding him from providing expert testimony on the issue of causation of the esophageal tear based on a radiologic opinion. *See* Dr. Albert's Brief at 5. Dr. Albert contends he was qualified under both the common law and statutory standards, and that his testimony was not cumulative of Dr. Hurwitz's testimony.

"Preliminarily, we note our standard of review concerning a trial court's ruling on a motion for new trial is as follows. This Court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or an error of law." *Yacoub v. Lehigh Valley Med. Assocs., P.C.*, 805 A.2d 579, 586 (Pa. Super. 2002), *appeal denied*, 825 A.2d 639 (Pa. 2003).

> Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 2000 PA Super 239, 758 A.2d 695, 707 (Pa. Super. 2000) [*appeal denied*, 567 Pa. 715, 785 A.2d 90, 2001 Pa. LEXIS 41 (Pa. January 4, 2001)] (quoting *Foflygen v. Allegheny General Hosp.*, 1999 PA Super 6, 723 A.2d 705 (Pa. Super. 1999), *appeal denied*, 559 Pa. 705, 740 A.2d 233 (1999)).

*(Footnote Continued)* ———————————————

511, 513 (Pa. Super. 1995) (*en banc*). Moreover, because final judgment has now been entered on the docket, as of August 22, 2014, we will "regard as done that which ought to have been done" in this matter. *Fanning v. Davne*, 795 A.2d 388, 391 (Pa. Super. 2002).

*Detterline v. D'Ambrosio's Dodge, Inc.*, 763 A.2d 935, 938 (Pa. Super.

2000). Furthermore,

> [w]hen we review a ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). In addition, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McClain v. Welker*, 2000 PA Super 299, 761 A.2d 155, 156 (Pa.Super. 2000) (citation omitted).

*Freed v. Geisinger Med. Ctr.*, 910 A.2d 68, 72 (Pa. Super. 2006), *aff'd*,

971 A.2d 1202 (Pa. 2009).

First, Dr. Albert claims the court erred in finding that he did not qualify

as an expert witness pursuant to the common law standard. Specifically, Dr.

Albert states because the court found he possessed "some expertise reading

and interpreting radiology images" by being an anesthesiologist, "all

common law requirements for testifying as an expert witness were

satisfied." Dr. Albert's Brief at 11. Dr. Albert points to his curriculum vitae

(CV) and deposition testimony to demonstrate his radiology experience,

which included, but is not limited, to the following: (1) he has the additional

qualification in transesophageal echocardiography, which involves the

interpretation of x-ray imaging; (2) he is familiar with chest imaging; (3) he

is experienced in reading computerized tomography (CT) scans as a result of his anesthesia experience with thoracic patients; (4) during his residency, he gained experience in radiology; (5) he has experience in co-reading films with radiologists; and (6) in cases of managing a patient, he reads radiology films himself. *Id.* at 12. Dr. Albert relies on *Freed*, *supra*, in support of his argument that an otherwise competent and qualified witness can provide expert testimony about causation.

> In general, to qualify as an expert witness, one must only "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience." *Flanagan v. Labe*, 547 Pa. 254, 257, 690 A.2d 183, 185 (1997); *see also* Pa.R.E. 702; [*McClain v. Welker*, 761 A.2d 155, 156 (Pa. Super. Ct. 2000)] (noting that the standard for qualification of an expert witness is a liberal one). Thus, in determining whether to admit expert testimony, the usual test to be applied is "whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question." *Flanagan*, *supra* at 257, 690 A.2d at 185.
>
> Applying this broad standard for expert testimony to an issue of medical causation, this Court in *McClain*, *supra*, cited our Supreme Court for the proposition that "an otherwise qualified non-medical expert [may] give a medical opinion so long as the expert witness has sufficient specialized knowledge to aid the jury in its factual quest." *McClain*, *supra* at 157 (citing *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525 (1995)).

*Freed*, 910 A.2d at 73 (footnote omitted). "If a witness possesses neither experience nor education in the subject matter under investigation, the witness should be found not to qualify as an expert." *Yacoub*, 805 A.2d at 591.

Here, the court found the following:

In the instant matter, the Court does not doubt Dr. Albert possesses "training, knowledge, intelligence, or experience" in the field of radiology, which he intends to testify as an expert in. By virtue of being [i]n anesthesiology, he will have some experience reading and interpreting radiology images. His September 11, 2012 testimony confirms as much. The question for the Court, though, is does he "possess more expertise than is within the ordinary range of training, knowledge, intelligence or experience[?]" The Court does not find that he does.

Dr. Albert has said: "[T]here is a fair bit of radiology in ultrasound … internal medicine … anesthesia. There is enough of it that you pick things up. You may not be willing to make the call of whether what type of tumor is what type of tumor, but you know that there is a mass there. Okay." Dr. Albert Deposition Tr. 40:13-20 (Sept. 11, 2012). In that same Deposition, Dr. Albert also says: "You kind of pick up radiology as you go." *Id.* at 39:6. These comments suggest to the Court Dr. Albert has some experience in radiology but not the required "more expertise than … the ordinary" that is required. Experts do not simply pick things up as they go or have a fair bit here and there.

Trial Court Order, 6/2/2014, at 2-3.

We agree with the court's sound analysis. At his deposition, Dr. Albert

proffered the following:

You kind of pick up radiology as you go. Most of mine is thoracic stuff. So you read chest x-rays. Even -- even as internal medicine, you just keep on going back and reading more, because as you learn more you can kind of fit things together to complete the disease process. There is always chest x-rays and CT's in the thoracic rooms when you are doing a bulk -- doing thoracic cases, lung resections. So you learn that you have to figure out what the surgeon is doing. You learn to read the films ahead of time to see what disease processes, whether you can figure out if it is going to be a difficult placement of a double wound tube, whether there is large pleural effusions that the person is going to desat on you very quickly. So you learn that your -- the more information you get out from the diagnostic tests actually do affect your anesthesia care, so you just keep on reading more and studying more.

Deposition of Dr. Andrew Michael Albert, 9/11/2012, at 39. Other than expressing familiarity with radiology necessary to perform his services as an anesthesiologist, Dr. Albert has not demonstrated he has a "reasonable pretension to specialized knowledge on the subject matter in question." *See Flanagan*, *supra*. Likewise, while Dr. Albert may have some experience in reading radiology images, he has not expressed that he has experience in interpreting and analyzing the images as applied to cases like Wife's surgery to the extent that the pressure flow of air or carbon dioxide caused such a disturbance in her body that an esophageal tear resulted.

Moreover, Dr. Albert's reliance on *Freed* is misplaced as we find that case is distinguishable from the present matter. In *Freed*, the plaintiff proffered an expert witness-nurse's testimony as evidence for the crucial causation issue in his case, "*i.e.*, that breaches in the standard of nursing care were the cause of the development and/or worsening of [his] pressure wound." *Freed*, 910 A.2d at 75. The trial court had refused to allow the nurse "to testify that breaches in the standard of nursing care had caused [the plaintiff's] pressure wounds." *Id.* at 74. On appeal, a panel of this Court noted that the expert witness nurse was "a registered nurse, having received a Bachelor of Science degree in nursing from the University of New Mexico in 1974. She ha[d] worked in various hospitals and private facilities, including a rehabilitative nursing home where she gained experience with adult wound care and long-term rehabilitation." *Id.* at 75. Based on these

qualifications, the panel determined the trial court abused its discretion, and concluded:

> [The nurse was] competent to provide expert testimony not only on the standard of nursing care, but also on the causative relationship between breaches in the standard of care and Appellant's pressure wounds. Her education and experience provide her with "more expertise than is within the ordinary range of training, knowledge, intelligence, or experience" concerning the cause of pressure wounds.

*Id.* Unlike the expert witness-nurse in *Freed*, Dr. Albert has not met his burden in presenting those specialized qualifications that would demonstrate he had the training, knowledge, intelligence, or experience necessary to testify about the field of radiology. Accordingly, we detect no abuse of discretion on the part of the trial court in precluding Dr. Albert from rendering expert radiology testimony under the common law standard.

Second, Dr. Albert argues the court erred in finding that he did not qualify as an expert under the MCARE Act standard. Dr. Albert's Brief at 13. Specifically, he states he only had to meet two qualifications under the MCARE Act because he was only speaking to causation, and not to the standard of care. *Id.* at 14. Relying on *Weiner v. Fisher*, 871 A.2d 1283 (Pa. Super. 2005), *appeal denied*, 936 A.2d 41 (Pa. 2007), Dr. Albert asserts the "more stringent requirements concerning the specialty and expert qualifications only apply when a medical expert is to testify" about the standard of care in a case. Dr. Albert's Brief at 14. As such, he states the only requirements he must meet are as follows: (1) possessing an

unrestricted physician's license to practice medicine in any state or DC; and (2) be engaged in or retired within the previous five years from active clinic practice or teaching. *Id.* Dr. Albert notes he "currently enjoys an unlimited physicians' license to practice medicine in Pennsylvania, Alabama, Kentucky, and Idaho" and he "is continuing to practice medicine and also teaches medicine." *Id.* (record citations omitted). Additionally, Dr. Albert alleges that a panel of this Court in *Gartland v. Rosenthal*, 850 A.2d 671 (Pa. Super. 2004), *appeal denied*, 936 A.2d 41 (Pa. 2007), held that a doctor's CV, showing that he was a licensed physician, was sufficient *prima facie* evidence that he was qualified to read x-rays.

With respect to expert testimony under the MCARE Act, we are guided by the following:

> With passage of the MCARE Act, the General Assembly created a more stringent standard for admissibility of medical expert testimony in a medical malpractice action by the imposition of specific additional requirements not present in the common law standard. *Gbur v. Golio*, 600 Pa. 57, 963 A.2d 443, 452 (Pa. 2009) (Opinion Announcing the Judgment of the Court); *id.* at 464 (Greenspan, J., concurring) (agreeing that, with the MCARE Act, the General Assembly raised the standards for an expert witness testifying to a physician's standard of care, but also noting that the statute permitted waiver of certain requirements under appropriate circumstances); *Wexler v. Hecht*, 593 Pa. 118, 928 A.2d 973, 986 (Pa. 2007) (Castille, J., dissenting). The MCARE Act's provisions as to the requisite qualifications for an expert witness testifying in a medical malpractice action against a physician are found in Section 512, which provides, in relevant part, as follows:
>
> > **(a) General rule.**--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses

sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

**(b) Medical testimony.**--An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

* * * *

**(c) Standard of care.**--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

(1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

(2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

(3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

* * * *

**(e) Otherwise adequate training, experience and knowledge.**-- A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and

knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five years.

40 P.S. § 1303.512.

Thus, pursuant to Section 512, to testify on a medical matter in a medical malpractice action against a defendant physician, an expert witness must be a licensed and active, or a recently retired, physician. In addition, in order to render an opinion as to the applicable standard of care, the expert witness must be substantially familiar with the standard of care for the specific care in question. Furthermore, the expert witness must practice in the same subspecialty as the defendant physician, or in a subspecialty with a substantially similar standard of care for the specific care at issue ("same specialty requirement"). Finally, if the defendant physician is board certified, the expert witness must be board certified by the same or a similar board ("same board certification requirement"). Importantly, the expert witness must meet all of these statutory requirements in order to be competent to testify. However, there is an exception to the same specialty and same board-certification requirements: if a court finds that an expert witness has sufficient training, experience, and knowledge to testify as to the applicable standard of care, as a result of active involvement in the defendant physician's subspecialty or in a related field of medicine, then the court may waive the same specialty and same board certification requirements.

*Vicari v. Spiegel*, 989 A.2d 1277, 1281-1282 (Pa. 2010).

Here, the court found the following:

Subsections (a) and (b) apply to non-standard of care testimony and subsection (a), (b), and (c) apply to standard of care testimony.

Of the two, Dr. Albert argues he did not want to testify to the standard of care but rather the non-standard of care issue of causation. Even if that is true, the Court properly excluded his testimony. First, the key phrase in subsection (a) is "sufficient education, training, knowledge and experience to provide credible, competent testimony." Dr. Albert desires to use

- 14 -

radiology reports as a basis to proffer his causation theory. The problem with this is he does not have the "sufficient education, training, knowledge and experience to" interpret those reports to craft credible, competent testimony. The Court hearkens back to Dr. Albert's deposition testimony where he stated he picked things up as he went along and had a fair bit here and there. If the MCARE Act is allegedly more stringent than the common law and the common law requires a witness to "possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience" than the Court interprets the word "sufficient" in subsection (a) to be at the very least akin to the common law standard. Consequently, if Dr. Albert cannot satisfy the common law standard, he cannot meet the MCARE Act standard as well.

Trial Court Order, 6/2/2014, at 4.

While Dr. Albert is correct that with respect to Subsection (b) of the MCARE Act and causation, only two requirements are necessary for an expert to be qualified. *See* 40 P.S. § 1303.512(b)(1-2). Nevertheless, Dr. Albert ignores the fact he must still meet the general requirements under Subsection (a) before he can be deemed qualified to testify as an expert witness, and as the trial court properly opined, Dr. Albert does not possess the "sufficient education, training, knowledge and experience to" interpret those radiology reports to provide competent testimony. *See* 40 P.S. § 1303.512(a).

Furthermore, we find *Gartland* is distinguishable from the present matter. In that case, the trial court determined that although the expert witness was knowledgeable about neurology, he did not have sufficient specific expertise to offer an opinion about the defendant-doctors, who were either radiologists or a neurologist. *Gartland*, 850 A.2d at 675. On appeal,

a panel of this Court disagreed, finding that the expert's CV indicated he was a neurologist, and that evidence "established *prima facie* his qualifications to read the X-rays in this case and to offer an opinion on what should have been done under the circumstances." *Id.* Nevertheless, the panel did note the following: "While we would probably not find him qualified to render such an opinion if the radiologists were reading X-rays of a leg, we believe that at least at the summary judgment stage and on this record, his opinion on x-rays relating to neurological problems and the standard of care for radiologists reading such x-rays should have been allowed." *Id.* at 675-676.

*Gartland* differs from the present case for two reasons: (1) the proceedings were at the summary judgment stage as opposed to the trial; and (2) Dr. Albert attempts to read radiology images in order to determine the cause of Wife's injury when he has not demonstrated that it is integral to his common practice of anesthesiology. Therefore, we conclude the court did not abuse its discretion in concluding that Dr. Albert was not qualified under the MCARE Act to opine about the radiology imaging.

Lastly, Dr. Albert complains the trial court erred in finding his testimony would have been cumulative of Dr. Hurwitz's testimony and therefore, excludable under Pennsylvania Rule of Evidence 403. The doctor states the testimony was corroborative and not cumulative because it is

evidence that "strengthens or bolsters existing evidence." Dr. Albert's Brief at 16.

Rule 403 provides: "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Evidence that strengthens or bolsters existing evidence is corroborative evidence; we have previously explained that corroborative evidence is not cumulative evidence." *Commonwealth v. Flamer*, 53 A.3d 82, 88 n.6 (Pa. Super. 2012) (citation omitted).

Here, the trial court found the following:

> In the instant matter, Dr. Albert proffered Robert Hurwitz, M.D. ("Dr. Hurwitz") as his expert witness. Dr. Hurwitz, an expert radiologist, intended to testify and proffer a causation theory of how [Wife]'s injury occurred that differed from the Plaintiff's. Dr. Hurwitz did this using the radiological images and clinical information available. Dr. Hurwitz's theory centered on the "periaortic air channels above the diaphragm and to the left of the expected course of a normal esophagus" as well as "a moderate right pleural effusion … [and] a small left pneumothorax." In light of this, Dr. Hurwitz reached the conclusion that the air dissected "the mediastinum from the retroperitoneal space." In other words, the air or carbon dioxide that was pumped into [Wife]'s stomach for the procedure played an integral role in her injury – not Dr. Albert's actions. Dr. Albert intended to testify about the same. In the Court's opinion, this is cumulative evidence and therefore properly excludable.

Trial Court Order, 6/2/2014, at 5.

We note that other than a bald assertion, Dr. Albert fails to explain how such evidence "strengthens or bolsters" existing evidence. As such, we agree with the trial court that Dr. Albert's and Dr. Hurwitz's theories behind the causation of Wife's injury were substantially similar.[7] Therefore, we again find the court did not abuse its discretion in excluding Dr. Albert's radiology testimony as cumulative.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/18/2015

---

[7] *See Klein v. Aronchick*, 85 A.3d 487, 501 n.7 (Pa. Super. 2014) (three different defense expert witnesses were permitted to testify on causation, and their testimony was not considered needlessly cumulative, because while all three experts reached the same conclusion, they approached the subject matter from diverse clinical perspectives), *appeal denied*, 104 A.3d 5 (Pa. 2014).